IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CLASSIC ALEXANDER, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) Case No. 06 C 1531 |
| BIOMERIEUX, INC. | ) HONORABLE CHARLES R. NORGLE ) ) |
| Defendant. | ) |

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the court is Defendant's Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, Defendant's Motion for Summary Judgment is granted.

**I. BACKGROUND[1]**

**A. Facts**

This case arises out of Plaintiff Classic Alexander's termination from her job at Defendant Biomericux, Inc., ("Biomerieux") in Lombard, Illinois. Alexander is an African-American, who was 63 years old when these events took place. Biomerieux produces petri dishes that are used for various types of environmental testing. In 1995, Classic Alexander ("Alexander") began working at Biomerieux's packaging department as a packaging technician.

---

[1] The court takes the undisputed facts from the parties' Local Rule 56.1 Statements, and notes disputed facts within the text.

1

Her duties included packing products into boxes, cleaning various rooms, and relieving production workers in other rooms in the plant.

In the summer of 2004, Alexander was still employed as a packaging technician. According to Biomerieux, Alexander enjoyed her job, and felt comfortable at the plant. Biomerieux further states that Alexander was friendly with her co-workers, Susanna Henney ("Henney"), and Arlene Bartys ("Bartys"). Then, in the fall of 2004, Biomerieux combined its packaging and production departments, and began cross-training employees in these departments so that technicians such as Alexander could handle all packaging and production functions.

Biomerieux states that in October 2004, Alexander stated to Production Manager Rick Badea ("Badea") that she felt discriminated against. When asked for examples, Badea claims that Alexander did not provide any in support of her claim. Badea told Alexander that she could meet with people in the Human Resources department if she wanted. In response to Alexander's meeting with Badea, Tamarah Wagner ("Wagner"), the Human Resources Representative, who worked in Biomerieux's St. Louis office, left two voicemail messages with Alexander to discuss these allegations. However, Alexander never contacted Human Resources regarding any claim of discrimination. Then, in January 2005, Alexander met again with Badea and told him that she felt that production supervisor Ilona Glaz ("Glaz") had discriminated against her due to race. When asked for examples of discriminatory conduct, Alexander said, "the way I was being treated and stuff."

As a result of Biomerieux's reorganization, Alexander spent less time in the packaging department, and more time in the production area. According to Biomerieux, Alexander was not happy about this change. The company claims that she did not want to work in the fill room, and

2

wanted to stay within the packaging department. After the cross-training began, Biomerieux states that other employees observed Alexander acting differently. In one instance, employees reported that they saw Alexander talking and laughing to herself. Additionally, employees noticed that Alexander isolated herself from co-workers. Biomerieux claims that Alexander told co-workers that she did not like working in the fill room, and that these co-workers perceived Alexander as angry at management, specifically Badea and Glaz.

Then, in early February 2005, Henney told co-workers Pat Yattoni ("Yattoni") and Nell Kozmic ("Kozmic") that Alexander had made threatening comments saying that if people "kept messing with her, she would bring a gun to work." Biomerieux alleges that Kozmic was worried about her safety, and on February 9 or 10, 2005, informed Glaz about what Henney said. Upon learning about this alleged threat, Glaz felt that Alexander might take violent action, given the context of Alexander's recent behavior change, such as the isolation, poor communication with co-workers, and her resistence to her new work environment. Glaz reported Alexander's remark to Badea, who in turn reported to his manager, Tony Donovan ("Donovan"), the Lombard facility's Director of Operations.

Donovan became concerned when he learned of Alexander's alleged remarks. According to Biomerieux, a recent incident occurred at the company's St. Louis, Missouri facility in which a supervisor had been beaten by an employee. Donovan had thought of this event, when he learned of Alexander's comments. In response to Badea's report to Donovan, the two men contacted Wagner, the Human Resources Representative, who worked in the St. Louis office. All three agreed that Alexander should be suspended.

On February 10, 2005, Donovan and Badea met with Alexander and informed her of the

suspension. According to Donovan, Alexander had little or no reaction when she was told of her suspension. Wagner interpreted this non-reaction as a sign that Alexander had in fact, made the gun remark. Also on February 10, Wagner interviewed several of Alexander's co-workers. These employees stated that Alexander had been acting strangely recently, and at least one employee said that Alexander exhibited "aggressive" behavior. Henney told Wagner that she heard Alexander say words to the effect of, "I'll bring a gun in and take care of" people on two occasions.

On that same day, Wagner had a phone conversation with Human Resources Director Laura Villa ("Villa"), and John Medinger ("Medinger"), Vice President of Human Resources regarding Alexander's comments. Medinger made the ultimate decisions as to retention and dismissal of employees. They did not discuss when Alexander made these remarks, only that they were made to co-workers. After his discussion with Wagner and Villa, Medinger concluded that Alexander had probably made these remarks, and that she posed a legitimate safety concern to Biomerieux's Lombard facility. Medinger decided to terminate Alexander's employment, as the best resolution to the situation. Villa agreed with Medinger and stated that "all of the conversations and investigation pointed to the fact that [Alexander] did in fact make the statement and that her threat was credible." Each of these human resources employees felt concerned for the safety of all of Biomerieux's employees in the Lombard facility.

On February 11, 2005, Biomerieux terminated Alexander's employment with the company. Wagner spoke with Alexander on the phone and informed her of Biomerieux's decision. According to Wagner, Alexander became upset, and denied making the comments about the gun. Wagner also stated that Alexander said that she would "take care of" the

4

employees who reported her actions to management. Wagner asked if Alexander meant she would commit acts of violence. Alexander said no, and that she would "take care of [Wagner] too."

**B. Procedural History**

On January 25, 2006, Alexander received a Notice of Right to Sue Letter from the EEOC. On March 20, 2006, she filed her Complaint in the United States District Court for the Northern District of Illinois, alleging racial discrimination and retaliatory discharge in violation of Title VII, and age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"). Then, on March 12, 2007, Biomerieux filed its Motion for Summary Judgment. Alexander filed her Response on April 2, 2007, and Biomerieux filed its Reply on April 11, 2007. Biomerieux's Motion for Summary Judgment is fully briefed and before the court.

## II. DISCUSSION

**A. Standard of Review**

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000); see also Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works

Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When a party moves for summary judgment, the court must view the record and all inferences in a light most favorable to the non-moving party. Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the non-moving party's favor must be drawn from specific facts identified in the record that support that party's position. See Szymanski, 231 F.3d at 364. Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d. 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

**B. Title VII- 42 U.S.C. § 2000e**

Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); see Whittaker v. Northern Illinois University, 424 F.3d 640, 645 (7th

6

Cir. 2005). In order to prevail under on a racial discrimination claim under Title VII, Alexander must "either show direct evidence of discriminatory motive or intent, or rely on the indirect burden-shifting method outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Bio v. Federal Express Corp., 424 F.3d 593, 596 (7th Cir. 2005).

Under the McDonnell Douglas method, a plaintiff who alleges racial discrimination must establish four elements: (1) that she is a member of a protected class; (2) that she is performing her job satisfactorily; (3) that she suffered an adverse employment action; and (4) that she was treated less favorably than at least one male colleague. Farrell v. Butler Univ., 421 F.3d 609, 613 (7th Cir. 2005) (citing Lim v. Trus. of Ind. Univ., 297 F.3d 575, 580 (7th Cir. 2002)).

Once the plaintiff has established a prima facie case, the burden shifts to the defendant to provide a legitimate, non discriminatory reason for the decision. Id. If the defendant satisfies its burden, the burden shifts back to the plaintiff to show that the defendant's explanation was pretextual. Id. To establish pretext, the plaintiff may show that the reasons given by the employer are factually baseless, were not the actual motivation for the decision, or were insufficient to motivate the decision. Stewart v. Henderson, 207 F.3d 374, 376 (7th Cir. 2000). The failure to establish any one of the initial four elements defeats a plaintiff's discrimination claim. Id. With these principles in mind, we turn to Biomerieux's Motion for Summary Judgment.

## C. Alexander's Title VII and ADEA Discrimination Claims

### 1. Alexander has not established a prima facie case of discrimination

As a preliminary matter, the court notes that "the McDonnell Douglas framework applies to both Title VII and ADEA claims." See Raymond v. Ameritech Corp., 442 F.3d 600, 610 (7th

7

Cir. 2006) (quoting Krehnavy v. Limagrin Genetics Corp., 294 F.3d 871, 87 (7th Cir. 2002)). Therefore, the court will analyze Alexander's Title VII and ADEA discrimination and retaliation claims together.

Alexander does not submit any direct evidence to create a factual dispute as to whether she was discriminated against based on her race. Direct evidence is evidence that shows the employer's intent without the need to rely on "inference or presumption." Bahl v. Royal Indem. Co., 115 F.3d 1283, 1290 n.6 (7th Cir. 1997). Direct evidence "speak[s] directly to the issue of discriminatory intent, [and] also relate[s] to the specific employment decision in question." Oates v. Discovery Zone, 116 F.3d 1161, 1170 (7th Cir. 1997). It is likely the case that the only real direct evidence of discriminatory intent is an admission by the employer. Logan v. Kautex Textron N. Am., 259 F.3d 635, 638 (7th Cir. 2001); Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994). Alexander submits no direct evidence in the form of admissions, documents or other materials that shows Biomerieux's intent to discriminate against her because of her race. As a result, the court must therefore proceed under the McDonnell Douglas burden shifting analysis.

The court finds that Alexander has not established a prima facie case of racial discrimination under Title VII or the ADEA. Alexander, an African-American, is a member of a protected class. However, Alexander cannot establish that she had performed her job in a satisfactory manner, or that similarly situated employees were treated more favorably than herself.

### a. Job Performance

Alexander's Title VII and ADEA claims fail because she cannot offer evidence to create a genuine issue of material fact that she had met Biomerieux's legitimate employment expectations. An employee who makes threats that she will bring a firearm to her place of employment cannot meet her employer's legitimate expectation of her employment. "The fact that [Alexander] completed her assignment has no bearing on whether she met [Biomerieux's] expectations regarding employee conduct." Fane v. Locke Reynolds, LLP, 480 F.3d 534, 540 (7th Cir. 2007); see Herron v. DaimlerChrysler Corp., 388 F.3d 293, 300 (7th Cir. 2004) (plaintiff who performed some parts of her job well, but had a confrontational attitude could not show that he met employer's legitimate expectations). Therefore, despite the fact that Alexander had received favorable evaluations from her supervisors, her statements about bringing a gun to work and "taking care of people" establishes that Alexander has not met her employers' expectations.

### b. Similarly Situated Employees

Alexander's Title VII and ADEA claims also fail because she cannot satisfy the similarly situated prong of the McDonnell Douglas test. A similarly situated employee "is one who is 'directly comparable to the plaintiff in all material aspects.'" Bio, 424 F.3d at 596 (quoting Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002)); see Walker, 410 F.3d at 396 (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)). To determine whether two employees are similarly situated, the court must "look at all relevant factors, including whether the employees "(I) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable

9

experience, education, and other qualifications-- provided the employer considered these latter factors in making the personnel decision.'" Bio, 424 F.3d at 596 (quoting Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 532 (7th Cir. 2003)); see Fane, 480 F.3d at 540-541.

Here, Alexander points to no individuals who worked at Biomerieux who can be considered similarly situated for purposes of Title VII or the ADEA. Alexander cannot establish that another employee engaged in similar conduct, i.e., threatening to bring a gun to work, and was treated more favorably than herself. Moreover, Alexander does not list specific employees' work history, educational background, or other relevant facts necessary for an analysis of similarly situated individuals under Seventh Circuit case law. See Fane, 480 F.3d at 540; Snipes v. Ill. Dep't of Corrs., 291 F.3d 460, 463 (7th Cir. 2002).

However, other Biomerieux employees have been terminated who engaged in less serious conduct than Alexander. In one instance, at the Lombard facility, Biomerieux states that it fired Laticia Plekavic ("Plekavic"), a Hispanic female, for her "intimidating management style where she would scream at employees and say hurtful things to them." Def.'s Stmt. of Mat. Facts, ¶ 77. Additionally, Carrie Osing ("Osing") lost her job at Biomerieux because she hit a co-worker with a cardboard tube and verbally taunted that co-worker. Id. Therefore, based on these examples, Alexander is unable to establish that any similarly situated employees were treated more favorably than herself.

### 2. Legitimate Reason for Termination

Even though Alexander has not established a prima facie case for discrimination under Title VII or the ADEA, with an abundance of caution, the court will proceed with the remaining McDonnell Douglas analysis. Assuming, arguendo, that Alexander has established a prima facie

case of discrimination, the burden shifts back to Biomerieux to establish a legitimate, non-discriminatory reason for Forrester's termination. See Ballance, 424 F.3d at 617.

Here, the court finds that Biomerieux's proferred reason for Alexander's termination is legitimate. Whenever an employee threatens physical harm to co-workers, and says that he or she will bring a firearm to work, the employer must take actions to protect the well-being of its employees. The primary objective of Title VII is "not to provide redress but to avoid harm." Erickson v. Wisc. Dep't of Corr., 469 F.3d 600, 605 (7th Cir. 2006) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 805-06 (1998)). In this instance, Donovan knew of a similar incident at Biomerieux's St. Louis facility in which an employee physically attacked a supervisor, causing serious damage. "Prevention can involve proactive steps . . . the greater the potential harm to the employee, the more vigilant the employer needs to be." Erickson, 469 F.3d at 606. As a result, Biomerieux's proferred explination for Alexander's termination is legitimate.

### 3. Pretext Argument

Lastly, after Biomerieux has established its legitimate reason for termination, the burden shifts back to Alexander to show that the proffered reason is pretextual. See Stewart, 207 F.3d at 376; see also Herron v. DaimlerChrysler Corp., 388 F.3d 293, 301 (7th Cir. 2004). In order to establish pretext, Alexander must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that [Biomerieux] did not act for the asserted non-discriminatory reasons." Fane, 480 F.3d at 541. The focus of a pretext inquiry is whether the employer's stated reason was "honest, not whether it was accurate, wise, or well-considered." Stewart, 207 F.3d at 378 (quoting Jackson v. E.J. Brach Corp., 176 F.3d 971, 983 (7th Cir. 1999)). The court will not "sit as a

11

superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision." Id. Moreover, it is not sufficient to prove that the reason was doubtful or mistaken. Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1, 147 F.3d 535, 541 (7th Cir. 1998). Pretext does not mean simply a mistake, but instead a lie, "specifically a phony reason for some action." Id. (quoting Johnson v. City of Fort Wayne, 91 F.3d 922, 931 (7th Cir. 1996)). The only concern is whether the legitimate reason provided by the employer is in fact an honest one. See Stewart, 207 F.3d at 378.

Here, Alexander has not identified any weaknesses, implausibilities, or raises any other questions of fact that would lend a jury the reasonable belief that Biomerieux's proferred reason for its decision to terminate Alexander was pretextual. Any argument "about the accuracy of the employer's assessment is a distraction . . . because the question is not whether the employer's reasons for a decision are 'right but whether the employer's description of its reason is honest.'" Jones v. Union Pacific Railroad Co., (7th Cir. 2002) (quoting Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997). Alexander merely denies making these statements. Besides her unsupported allegations, she offers no evidence to create a genuine issue of material fact as to whether Biomerieux's reason was dishonest.

Biomerieux, on the other hand, has stated Wagner, Donovan, and Glaz engaged in a discussion regarding Alexander's employment, conducted an investigation, and eventually decided that the best solution for the company was Alexander's termination. As a result, the court finds that Alexander has not created a genuine issue of material fact as to whether discriminated against her on the basis of her race. Therefore, summary judgment is granted to Biomerieux on the Title VII and ADEA discrimination claims.

## D. Alexander's Retaliation Claims

Next, Alexander alleges that Biomerieux "retaliated against [her] for having opposed its unlawful employment practices by terminating her...." Compl., ¶ 24. Title VII and the ADEA "makes it unlawful 'for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful practice by [Title VII].'" Tomanovich v. City of Indianapolis, 457 F.3d 656, 662-63 (7th Cir. 2006); see Racicot v. Wal-Mart Stores, Inc., 414 F.3d 675, 678 (7th Cir. 2005).

A plaintiff may "prove retaliation by using either the direct method or the indirect, burden-shifting method." Tomanovich, 457 F.3d at 662 (quoting Moser v. Ind. Dept. of Corr., 406 F.3d 895, 903 (7th Cir. 2005)). Under the direct method, "a plaintiff must show that '(1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) [there was] a causal connection between the two.'" Id.

In order to prove retaliation under the indirect method, "the plaintiff must establish a prima facie case by showing that: (1) he engaged in a statutorily protected activity; (2) he met the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similiary situated employees who did not engage in statutorily protected activity." Id. (quoting Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998)).

If the plaintiff is able to establish a prima facie case, "the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action." Adusumilli, 164 F.3d at 362. Then, "if the employer meets its burden, the burden shifts back to

13

the plaintiff to demonstrate that the employer's reason is pretextual." Tomanovich, 457 F.3d at 663.

### 1. Direct Method

Alexander's Retaliation Claim fails under the direct method because she cannot establish a casual connection between her statutorily protected activity, and the adverse employment action. First, the only evidence Alexander provides to establish that she engaged in a statutorily protected activity is that in October 2004, she complained to Badea that Glaz had treated her "differently." Pl.'s Resp., at 3; Pl. Stmt. Of Mat. Facts, ¶ 8. Then, in January 2005, Alexander alleges that she made a second complaint to Badea about Glaz. In her deposition, when Alexander was asked about specific instances of discrimination, she said that "she was being treated different from the rest." She stated that Glaz had laughed at her, and wouldn't speak directly to Alexander. Alexander states that Glaz didn't specifically say anything to her, and she never asked Glaz why she had laughed at her. Def.'s Stmnt. of Mat. Facts., App. 2, Ex. B, p. 3.

Therefore, even if the court construes Alexander's vague complaints to management as protected activity, she cannot establish a causal connection between these acts and her termination. Plainly put, Alexander lost her job because she threatened to bring a deadly weapon, in this case a gun, to her place of employment, and take care of people. The Seventh Circuit has "consistently held that an employee's insubordination towards supervisors and co-workers, even when engaged in protected activity, is justification for [adverse employment action]." Khan v. United States Sec'y of Labor, 64 F.3d 271, 279 (7th Cir. 1995). Once Biomerieux learned of Alexander's statement about carrying a gun to work, and conducted an

inquiry, it decided to terminate her employment. Given this set of facts, Alexander cannot show that "but for" her protected conduct, she would not have been fired.

## 2. *Indirect Method*

Under the indirect method, Alexander cannot establish that Biomerieux retaliated against her for any protected activity. Just as in her discrimination claims, Alexander is unable to establish that she had met her employer's legitimate work expectation, or point to any similarly situated co-workers who were treated more favorably than herself. See Brewer v. Bd. of Trustees of Univ. of Ill., 479 F.3d 908, 923-24 (7th Cir. 2007). As noted previously in this opinion, an employee who threatens to bring a gun to work cannot reasonably be viewed as meeting legitimate employment expectations. Additionally, Alexander points to no other co-worker who engaged in similiary activity, yet was treated in a more favorable manner. In fact, Biomerieux has listed two other employees who were terminated for their physically abusive behavior. A plaintiff's "failure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim." Roney v. Ill. Dep't. Of Transp., 474 F.3d 455, 459 (7th Cir. 2007). As a result, Alexander's retaliation claims under Title VII and the ADEA fail.

## III. CONCLUSION

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

ENTER:

_____

CHARLES R. NORGLE, Judge

United States District Court

DATED: 4/30/07